**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CHERYL JOHNSON, IN HER CAPACITY AS MOTHER AND NATURAL GUARDIAN OF MINOR CHILD S.M.**<br><br>AND<br><br>**SHAQUEIA JOHNSON, IN HER CAPACITY AS MOTHER AND NATURAL GUARDIAN OF MINOR CHILDREN S.N.N-M AND S.T.M-J**<br><br>AND<br><br>**JONATHAN J. JAMES, ESQUIRE, AS ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF SAUL MONTGOMERY**<br>PLAINTIFFS<br>V.<br><br>**CITY OF PHILADELPHIA,**<br>**P/O KRISTOPOHER PANARELLO #5024,**<br>**P/O KENT CHAMBERLAIN, #1491,**<br>**P/O SALIK PLUMMER #6312**<br>**Lt. Bisarat Worede #72,**<br>**Sgt. Walter Medycki #8742,**<br>**Sgt. John McBride #502**<br>**P/O Jonathan Harvey #9304**<br>**P/O Joseph Bohannon #1721**<br>**P/O Henry Lewis #3295**<br>**JOHN OR JANE DOE #1-20**<br>DEFENDANTS. | CIVIL ACTION NO: 21-cv-05541<br><br>JURY TRIAL DEMANDED |

# AMENDED COMPLAINT

## INTRODUCTION

1. This is a civil rights action brought under 42 U.S.C. § 1983 and the Pennsylvania Wrongful Death and Survival Acts, to redress the deprivation of the rights of decedent Saul Montgomery III

and his heirs, for defendants' deliberate indifference to his vulnerability to suicide, that resulted in his suicide while in the custody of Philadelphia police from the 14th and 35th Police Districts.

## JURISDICTION

2. This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343. Plaintiff further invokes the pendent jurisdiction of this Court, provided by 28 U.S.C. § 1367, to entertain claims arising under Pennsylvania state law.

## PARTIES

3. Plaintiff **Shaqueia Johnson,** at all times relevant to this Complaint, was and is a resident of the Commonwealth of Pennsylvania and is the mother and natural guardian of minors **S.N.N-M AND S.T.M-J**, who are the natural children of decedent Saul Montgomery III.

4. Plaintiff **Cheryl Johnson,** at all times relevant to this Complaint, was and is a resident of the Commonwealth of Pennsylvania and is the mother and natural guardian of minor **S.M.** who is the natural child of decedent Saul Montgomery III.

5. Jonathan J. James, Esquire is undersigned counsel who is the administrator of estate of decedent Saul Montgomery III for the purpose of this litigation only.

6. Defendant City of Philadelphia is a municipal governmental entity in the Commonwealth of Pennsylvania, which owns, operates, manages, directs, and controls the city jail located inside the 35th District Philadelphia Police Department at Broad and Champlost Streets, Philadelphia, PA, and employs the below referenced police officers.

7. At all times relevant to this Complaint, Defendants Panarello, Chamberlain, Worede, Medycki, McBride, Harvey, Bohannon, and Lewis were employees of the Philadelphia Police Department who were working at the 14th and/or 35th Philadelphia Police Districts, acting under

color of state law, and within the scope of their employment. They are being sued in their individual capacities.

8. At all times relevant to this Complaint, all defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to the Estate of Saul Montgomery III and his heirs.

## ALLEGATIONS COMMON TO ALL COUNTS

9. Plaintiff hereby incorporates the preceding paragraphs of this Complaint, as set forth above.

10. At the time of his death on December 20, 2019, Decedent Saul Montgomery III was 32-year-old male, who was the ex-boyfriend of Plaintiff Cheryl Johnson, and the father of her minor child.

11. On December 7, 2019, Plaintiff Cheryl Johnson swore out a Protection from Abuse Petition against Saul Montgomery III, alleging that, at 7:30 AM that morning, her "ex-boyfriend broke into my home and was standing over me while I was sleeping in the bed with my new boyfriend and my baby, he punched me in the face. I got up ran out of the house and flagged down a police officer, but he was not arrested."

12. Plaintiff Cheryl Johnson also alleged that, previously, "he rammed his car into mine twice in the past and knocked me unconscious in the past."

13. A temporary PFA order was issued, and a hearing was scheduled for December 11, 2019.

14. On December 11, 2019, the hearing was continued because Decedent Saul Montgomery III was not served with the PFA.

15. On December 18, 2019, a warrant for Decedent's arrest was issued based upon an assault on Cheryl Johnson that was alleged to have occurred on November 28, 2019.

16. On December 19, 2019, at approximately 9:00 AM, Decedent came knocking on her door screaming about needing to see children and then about needing money.

17. After leaving twice, Decedent returned a third time and was angry because Plaintiff Cheryl Johnson had called Decedent's sister, who, upon information and belief, called Decedent and told him to leave Cheryl Johnson alone.

18. Plaintiff had also called the police several times which resulted in the arrival of Philadelphia Police Officers Erik Lee and Kristopher Panarello both from the Philadelphia Police 14th District.

19. Plaintiff Cheryl Johnson provided either Defendant Panarello or Erik Lee with a copy of the PFA that she had filed.

20. Decedent was taken into custody by P/O Erik Lee and placed put into rear of a police car.

21. A short time later Defendant Panarello handed Decedent's car keys to Plaintiff Cheryl Johnson and Defendant Lee told her that Decedent would like to speak to her.

22. Plaintiff Cheryl Johnson approached the police car where Decedent was seated and, in the presence and ear shot of Defendant Panarello, Decedent, who was crying, stated words to the effect that, "you are putting me in jail. I am going to kill myself," and "I cannot live without 'Duke' [their son]."

23. Decedent repeated this threat loudly, saying that he was going to use his shoelaces to kill himself.

24. Defendant Cheryl Johnson locked eyes with Defendant Panarello and said, "Did you hear that? He needs help," prompting Panarello to reply that she should not worry about it; they will take all of his possessions, and "we will take care of him."

25. Defendant Panarelo and Defendant Lee stated further to Plaintiff Cheryl Johnson that her presence was riling up Decedent, and advised her to go inside her home, which she did.

26. According to interviews conducted by personnel from the Internal Affairs Divison which was tasked with investigating Decedent's suicide, both Defendant Panarello and Defendant Lee denied that they heard Decedent say anything about killing himself with shoe laces, or having any conversation about this subject with Cheryl Johnson.

27. Defendant City of Philadelphia, through its Police Department, put into effect police directives are a distillation of the best practices and procedures for the screening of persons who are or may pose a suicide risk and the prevention of suicides through enhanced surveillance and frequent inspections; and represent the professional standard for law enforcement personnel to employ in dealing with persons taken into custody.

28. Philadelphia Police Directive 7.8, Appendix C (entitled "Detainee Safety") provides: "Philadelphia Detainees who appear to be at "high-risk" for causing injury to themselves or others will be handled with extreme caution. Information outlined in Appendix "E" - "High-Risk Suicide Detainees" will be utilized to aid in the processing of these individuals."

29. Police Directive 7.8, Appendix C, also addressed the frequency with which police personnel must inspect the cell rooms in the police stations where detainees are placed:

**10. CELL BLOCK/DETENTION ROOM INSPECTIONS**

A. District

1. The time of each inspection will be recorded in the Prisoner Log Book (75-297), noted on the S&R [Sending and Receiving Sheet] and will be conducted as follows: (PLEAC [Pennsylvania Law Enforcement Accreditation Commission] 3.1.21 a, b, c)

a. The ORS [Operations Room Supervisor] will, once per tour, conduct checks of the Cell Room. During this check, the ORS will review and sign (initials and badge number) the Prisoner Property Bags.

b. The review will consist of checks for completeness and legibility. If information is missing or unable to be read, the ORS [Operations Room Supervisor] will have the personnel who created the bag, either rewrite the information or create a new bag. If information is rewritten on the bag, personnel, in the presence of a supervisor, will initial with their badge number next to the change.

2. The on-duty Lieutenant will conduct a review of the ORS signatures on the Prisoner Property Bags during their twice a tour inspection of the Cell Room.

3. Cell Block Attendants and/or trainees will inspect the cellblocks at, a minimum of, fifteen (15) minute intervals or as scheduled by the ORS, but no later than every thirty (30) minutes.

**NOTE:** Should any personnel, during Cell Block/Detention Room Inspections, perceive that a detainee's behavior or statements indicate they may be a danger to themselves or others, will take immediate action to ensure the health and safety of the detainee. Personnel will notify a supervisor of the situation and document it on the medical checklist.

4. When a detainee is violent, self-destructive or under the influence of drugs or alcohol, they will be placed in the designated special observation cell and observed at intervals not to exceed ten (10) minutes. (PLEAC 3.1.13) The detaining unit's supervisor will ensure that the duties of the Cell Block Attendant are limited to the cell block area when a special observation cell is in use.
.

30. Police Directive 7.8, Appendix E provides:

**APPENDIX "E" SUBJECT: HIGH-RISK SUICIDE DETAINEES**

**1. POLICY**

A. Personnel must take particular steps in identifying detainees who may exhibit tendencies toward suicide. These detainees may be at high risk for potentially causing harm to themselves or others and must be handled with extreme caution.

B. All Police personnel, and in particular those assigned to duties involving facilities where detainees are being held, will review and become familiar with this appendix.

C. Supervisors will ensure that all personnel assigned to holding facility/cell block duties (i.e. PDU [Police Detention Unit], DBC [Divisonal Booking Center] personnel) are familiar with the high-risk factors contained in this Appendix.

**NOTE**: A copy of this appendix will be posted at appropriate holding facility locations and shall act as a guide for the identification of suicidal behavior in detainees.

## 2. FACTS ABOUT SUICIDE IN HOLDING FACILITIES

A. Suicide is the number one cause of death in jails and lockups.

B. Hanging is the predominant method used by suicidal detainees.

C. The vast majority of suicide victims were not screened at time of arrest for potential suicidal behavior.

D. The first three (3) hours of detention are the most critical for suicide attempts:

1. Suicide prevention starts with the first minute of contact with the individual and ends with the last minute when they are transferred to the custody of another agency or released.

## 3. PERSONALITY PROFILES OF SUICIDAL BEHAVIOR

A. The following information outlines some of the characteristics and behaviors of high-risk suicide detainees. It is important to note that some detainees may be at risk and do not exhibit these warning signs. Therefore, it is imperative that the procedures specified in this directive be closely followed in the handling of any detainee. Profiles do not predict and prevent all suicides. Police should safeguard against any injurious action by a detainee whether or not they display any of the following factors. (PLEAC 3.1.13)

1. Potential suicide pre-disposing factors include:

a. Recent, excessive drinking and/or use of drugs
b. First time arrestee
c. Juvenile/young adult
d. Arrested for non-violent offense (Misdemeanor/Summary)
e. Noticeable behavior changes - may act very calm once the decision is made to commit suicide - extreme anxiety/fear
f. Recent loss of stabilizing resources - wife/loved one - job/school/home – finances
g. Severe guilt or shame over the offense
h. Same-sex rape or threat of it while in custody
i. Previous suicide attempts or history of mental illness
j. Poor health or terminal illness
k. Talks about or threatens suicide
l. Severe agitation or aggressiveness
m. Projects helplessness/hopelessness - "No sense of future"

n. May try to hurt self - attention-getting gestures
o. Any other unbearable situation or combination of events
p. Paranoid delusions and/or hallucinations
q. DEPRESSION - Depression is the most important factor indicating suicidal tendencies - extreme sadness, crying, withdrawal, lethargy, loss of self-esteem and blameworthiness are some of the characteristics exhibited by depressed individuals.

**NOTE**: The intent of this profile is to sensitize holding facility personnel to those characteristics appearing most often in jail suicide victims, while acting as a supplement to the existing warning signs and behavior patterns that are observed in the detection of suicidal behavior. These pre-disposing factors may appear any time during detention. DIRECTIVE 7.8 - 2 APPENDIX “E”

**4. POLICE PERSONNEL RESPONSIBILITIES: SUICIDIAL DETAINEES**

A. At the time of arrest and while transporting an individual, the arresting and transporting officer(s) are the first to observe signs and symptoms of a potential suicide. The arresting and transporting officer(s) should be alert to comments, gestures and the display of actions by the arrestee that may indicate a possibility of the person causing harm to themselves.

B. It is imperative that communication between arresting, transporting and detaining officer(s) occurs in reference to any observed behaviors of detainees. The detection of suspected suicidal behavior and the transfer of this information are essential in preventing suicide or other incidents in police custody.

1. Officers shall notify their immediate supervisors of any person in police custody who exhibits suicidal behavior. Supervisors will ensure that the Detainee's Medical Checklist is affirmatively answered in these cases. (PLEAC 3.1.13)

2. Refer to Directive 5.4, “Extraordinary Occurrences in Cell Blocks”, to determine the investigative responsibilities for suicide incidents occurring in police holding facilities.

C. Basic practices for handling suicidal detainees

1. Trust your own judgment.
a. If you believe that someone is going to harm themselves, ACT ON YOUR BELIEF.
2. Stay with a suicidal person.
3. Maintain contact and conversation.
4. Listen patiently.
a. Encourage the detainee to talk and express their feelings.

IMPORTANT: Suicide is less likely to occur if you keep the individual talking or engaged in conversation.

5. Whenever possible, place suicidal detainees in a cell with at least one other person. (PLEAC 3.1.13)
6. Utilize a fully operational suicide prevention cell, if available.

D. Positive characteristics to be practiced by detaining officers:

1. Most important - Exhibit fairness.
2. Show no favoritism.
3. Keep promises
    a. A broken promise is a lie - Only promise what you can deliver.
4. Use power and authority constructively
    a. Do not show authority/power for the sake of oppression.
5. Do not be condescending - Don't put people down.
6. Do not criticize people in public.
7. Answer questions - If you cannot answer the question, refuse with courtesy.
8. Ask, don't order - Instill cooperation.
9. Keep an open mind - Do not preach to the detainee.
10. Leave personal problems at home.
11. Don't yell or swear - Treat others as you would be treated:
12. * BE PROFESSIONAL *

**NOTE:** The above listed positive characteristics are expected to be practiced by all officers when interacting with detainees, but are crucial when dealing with a suicidal detainee.

31. Following Decedent's arrest, Defendant Chamberlain and Defendant Plummer arrived and transport him and transported Decedent to the 35th District police station.

32. According to Defendant Chamberlain, "When we were walking him over to the wagon, P/O Lee or maybe P/O Panarello said to keep an eye on him because he may he suicidal. I checked that off on the [Adult Prisoner] Flow chart. When we got to CCTV [35th District Divisional Booking Center (DBC)], he was calmed down, and answered no to all the questions that I asked on the Mental health form and the medical checklist."

33. Defendant Chamberlain stated further stated that after he checked off "Suicidal" on the Prisoner Flow Chart, he "then crossed it out and initialed because the male answered all of the questions saying that he was not suicidal, and that Decedent signed this form in his presence. Chamberlain added:

> He was a little confused as to why he was arrested. He mentioned that Ms. Johnson had a PFA against him, but it was thrown out after they went to court. He thought he was being arrested for violating the PFA. I informed him that he was arrested for a Warrant for the previous domestic assault that I handled there. He seemed calm. He mentioned that he had a newborn, and was asking if he'd be out in time to see her on Christmas. He was saying that he just wanted to go see his kids.

34. Defendant Panarello and Defendant Lee denied that that they told Defendant Chamberlain that Decedent was suicidal.

35. When asked if he actually informed anyone at the 35th District that Decedent was suicidal, Defendant Chamberlain replied, "Yes, I told them that I was warned about it but that he answered no to all the questions. Mr. Montgomery indicated that he just said it in the heat of the moment and that he calmed down. He answered no to all the questions once at CCTV."

36. Defendant Plummer claimed that, despite witnessing Defendant Chamberlain ask Decedent all of the suicide questions on the Adult Prisoner Flow Chart, the Medical Checklist, and the Mental Health Screen Forms, he did not know that Chamberlain had checked the "suicidal" box on the the Prisoner flow chart, and that neither Chamberlain nor any other police officer informed him that Decedent was suicidal.

37. Defendant Chamberlain stated that he did not recall exactly who he told about it [Decedent being suicidal], "I kind of just said it to all of them" who were the "usual people who worked there, including P.O Harvey.

38. In his IAD Interview, Defendant Harvey, who was the 35th District turnkey, stated that he did not recall Defendant Chamberlain or Defendant Plummer informing him that Decedent may be suicidal, and despite the fact that he completed a portion of the Adult Prisoner Flow Chart, he did not recall seeing that the "suicidal" box on the first page was checked and then crossed out.

39. A review of the DBC Prisoner Log (75-297) shows that [Decedent] Saul Montgomery was brought into the DBC on 12-20-19 at 12:40 PM and placed into cell number six, a non-suicide watch cell.

40. The log also indicates that Decedent was removed from cell number six at 3:00 PM by Det. Bransfield to be interviewed by Detectives Branfield and Goshert. He was returned to cell number six at 3:40 PM.

41. IAD's review of the videos of the interview reviews is as follows:

Video #1

14:59:23 - Video begins with Mr. Montgomery sitting inside interview room.

15:01 :50 - Det. Bransfield and Det. Goshert enter the interview room and begin interviewing Mr. Montgomery. Det. Bransfield does not believe Mr. Montgomery is being truthful and decides to end the interview.

15:18:00 - Mr. Montgomery begins crying and saying "I need my boy."

15:18:27-Det. Goshert exits the room first followed by Det. Bransfield. Mr. Montgomery continues to cry and say "I need my boy."

15 :21 :08 - Det. Bransfield opens the door to the interview room and tells Mr. Montgomery that he is going to take him back to the DBC.

15:21:26 - Mr. Montgomery continues to cry and said "I know I'm not going home to my son today, it's over." Det. Bransfield closes the door and leaves the interview room again. Mr. Montgomery continues to cry for the remainder of the video.

15:21 :35 - Video ends

42. The IAD review of the second video is as follows:

Video #2

15:28:47 - Video begins with Det. Bransfield and Mr. Montgomery in the room.

15:28:57 - Det. Bransfield asked Mr. Montgomery, "Are you gonna tell me nonsense again?" Mr. Montgomery responded, "I'm gonna tell you everything."

15:28:57 - Det. Bransfield exits the room. As Det. Bransfield exits, Mr. Montgomery says something that in not understandable. Det. opens the door again and said, "What's up?" Mr. Montgomery responded, "I know I'm done." Det. Bransfield said "Hold on" and closed the door.

15:29:50 - Mr. Montgomery, in the room alone, said "Sitting six fucking months dog." Mr. Montgomery begins crying again and said, 'Tm gonna miss my son's birthday." "I can't mis my boys birthday."

15:32:00 - Mr. Montgomery appears to say 'Tm gonna kill myself," but it is not perfectly clear. Mr. Montgomery continues to cry and saying "I need my son."

15:32:31 -Det. Bransfield and Det. Goshert enter the room and attempt to interview Mr. Montgomery again. Mr. Montgomery becomes uncooperative and said, "Man, I'm not going home today, I'm missing my son's Christmas, I ain't talking, fuck that. I ain't talking. I ain't going home today, I'm glad ya'll wasted taxpayers' money, she ain't gonna come to court. Fuck that."

15:33: 16 - Det. Bransfield said "Okay" and he and Det. Goshert leave the room and close the door.

15:33:27 - Video ends.

43. Neither Detective was asked about the protocol if the person they are interrogating is a suicide risk, but it is reasonable to assume that he would have been monitored in keeping with Directive 7.8.

44. The Prisoner Log also indicates that cell block checks were conducted by Sgt. Phan and Defendant Harvey, from 6:30 AM through 2:30 PM, except Sgt. Phan had been reassigned much earlier than 2:30 PM, and therefore, he could not have conducted all the cell block checks that the form indicated he had performed.

45. The IAD investigation concluded that this showed that the prisoner logbook entries were more than likely entered at the start of the tour as opposed to after each check is completed. There are no checks listed on the log, which were conducted by either Defendant Worede or Defendant Medyicki during the 8:00 AM to 4:00 PM shift.

46. The IAD investigation revealed that violations of Philadelphia Police Department Directive 7.8: Adult Detainees In Police Custody, were sustained against Defendant Worede, Defendant Medycki, Defendant McBride, Defendant Chamberlain, Defendant Harvey, Defendant Bohannon, and Defendant Lewis.

47. The IAD investigation made the following findings:

a. Philadelphia Police Directive 7.8, Appendix C states, "The time of each inspection will be recorded in the prisoner log book (75-297), noted on the S&R and will be conducted as follows." The directive further states, "The on-duty Lieutenant will conduct a review of the ORS [Operations Room Supervisor] signatures on the prisoner property bags during their twice a tour inspection of the cell room.'

b. Lt. Worede stated that during the 8:00 AM to 4:00 PM tour of duty on 12-20-19, he was the lieutenant assigned to patrol operations within the 35th District.

c. Lt. Worede should have conducted two cell block inspections during his tour of duty on 12-20-19. During those checks, Lt. Worede would have discovered that Sgt. Medycki was not signing the prisoner logbook or the prisoner property bags. Lt. Worede could have then ensured that Sgt. Medycki was performing his duties properly.

d. Philadelphia Police Directive 7.8 states, "The ORS will conduct reviews of the Prisoner Flow Charts during their hourly checks of the cell block. The review will consist of checks for completeness and legibility. If specific information is missing from the document, the ORS will instruct personnel to fill in the necessary information. Upon review, the ORS will sign (name and badge number) the Prisoner Flow Chart to verify compliance. These reviews will be documented on the daily Sending and Receiving report."

e. Sgt. Medycki stated that he does not recall covering as the ORS on 12-20-19 during the 8:00 AM to 4:00 PM tour of duty. A review of the 75-48's completed during that tour of duty indicates that Sgt. Medycki was in fact the covering supervisor and acting as the ORS.

f. Sgt. Medycki should have been performing hourly cellblock inspections and reviewing the Prisoner Flow Charts of each prisoner being held in the DBC. These checks should have been documented and would have presented Sgt. Medycki the opportunity to observe the suicide risk box being checked off and scratched out on Saul Montgomery's flow chart. Sgt. Medycki could have then instructed the cell room attendees to place Saul Montgomery into a suicide prevention cell.

g. Sgt. McBride stated that he was the assigned ORS for the 4:00 PM to 12:00 AM tour of duty on 12-20-19 at the 35 th District. Sgt. McBride worked the 2:30 PM to 10:45 PM tour of duty. Sgt. McBride added that he did conduct his required cell room checks and the checks were accurately documented on the prisoner logbook and the S&R. Sgt. McBride stated that he did not review the paperwork related to Saul Montgomery until after the incident occurred

h. Sgt. McBride should have reviewed the Prisoner Flow Charts and should have seen the suicide risk box being checked off and scratched out on Saul Montgomery's flow chart. Sgt. McBride could have then instructed the cell room attendees to place Saul Montgomery into a suicide prevention cell.

i. A review of the Northwest DBC prisoner log book reveals that there were no signatures or any other documentation listing Lt. Worede or Sgt. Medycki as conducting required cell room inspections.

j. A review of the 35th District Sending and Receiving report, for 12-20-19, during the 8:00 AM to 4:00 PM tour of duty, reveals that no entries were made listing any cell room inspections conducted by Lt. Worede or Sgt. Medycki.

k. Philadelphia Police Directive 7.8, Appendix E states, "It is imperative that communications between arresting, transporting and detaining officer(s) occurs in reference to any observed behaviors of detainees. The detection of suspected suicidal behavior and the transfer of this information are essential in preventing suicide or other incidents in police custody."

l. P/O Chamberlain stated that he received information that Saul Montgomery may be suicidal and that he relayed that information to the Northwest DBC personnel. All DBC personnel as well as P/O Plummer, stated that PIO Chamberlain did not inform them that Mr. Montgomery may be suicidal.

m. P/O Chamberlain checked the suicidal box of the security risks section of the Prisoner Flow Chart and then crossed it out after questioning Mr. Montgomery. P/O Chamberlain should have made sure that the DBC personnel were aware of potential suicidal thoughts or actions of Mr. Montgomery, to ensure Mr. Montgomery's safety while in police custody.

n. Philadelphia Police Directive 7.8 states, "The arresting officer will prepare a Prisoner Flow Chart (75-582) which will capture all biographical" and "arrest information." The directive further states, "This form must follow the detainee through their processing phase." "During the intake procedure, the arresting officer or cell room personnel will ensure the property inventory and disposition are noted by listing the Property Bag number on the Prisoner Flow Chart. Officers will ensure this document is filled out in its entirety and must include entries for the below items. D. Security risks (Assaultive, attempted escape, etc.,) and notifications to subsequent personnel, if applicable."

o. P/O Harvey stated that on 12-20-19, he was assigned to the Northwest DBC during the intake of Saul Montgomery. P/O Harvey does not recall the transporting officers informing him that Mr. Montgomery may be suicidal. P/O Harvey added that DBC personnel are responsible for reviewing the paperwork of prisoners brought into the DBC; however, he does not recall seeing the suicide risk box checked off on Mr. Montgomery's flow chart.

p. P/O Bohannon stated that on 12-20-19, he was assigned as the desk person inside of the Northwest DBC, during the intake of Saul Montgomery. P/O Bohannon stated that his responsibility as the desk person is to review the paperwork for all prisoners brought into the

DBC, to ensure it is completely filled out. P/O Bohannon added that he did review the paperwork for Mr. Montgomery; however, he does not recall seeing the suicide risk box checked off on Mr. Montgomery's flow chart.

q. P/O Lewis stated that on 12-20-19, he was assigned as the desk person inside of the Northwest DBC during the 4:00 PM to 12:00 AM tour of duty. P/O Lewis worked from 2:30 PM to I 0:45 PM and Saul Montgomery was being held inside of the DBC; however, Mr. Montgomery was brought in during the previous tour of duty. PIO Lewis stated that he did review Mr. Montgomery's paperwork; however, he does not recall seeing the suicide risk box checked off.

r. P/O Harvey, P/O Bohannon, and P/O Lewis all reviewed or should have reviewed Mr. Montgomery's flow chart. The officers should have seen the suicide risk box checked off and therefore should have ensured that Mr. Montgomery was placed into a suicide prevention cell.

48. Decedent was placed in a holding cell by himself where he was later found dead having hung himself with his shirt.

49. The above-named Defendants did not place Defendant on a suicide watch and/or did not follow the police procedures set forth above to prevent the death by hanging of a known suicide risk.

50. At all times relevant to this Complaint, as evidenced by the failures outlined above, as well as the refusal to release the IAD report, Defendant City of Philadelphia, with deliberate indifference, failed to properly train, supervise and discipline their employees and agents to ensure that its policies and procedures are followed to mitigate significant risks of suicide.

51. As a direct and proximate cause of the actions of Defendants, Decedent suffered the following injury and damages:

a. Violation of his constitutional rights under the Fourteenth Amendment to the United States Constitution and the laws of the Commonwealth of Pennsylvania to due process of law;

b. Loss of his life and the enjoyment of his life, including complete loss of earnings and earnings capacity;

c. Extreme physical pain and suffering and emotional trauma and suffering.

## WRONGFUL DEATH AND SURVIVAL ACTIONS

52. Plaintiff James, as Administrator of the Estate of Saul Montgomery III, brings this action on behalf of Decedent's heirs under the Pennsylvania Wrongful Death Act, 42 Pa. C.S. § 8301.

53. Decedent's heirs have, by reason of his death, suffered pecuniary loss, and claim damages for the pecuniary losses including but not limited to damages for all medical expenses, funeral and burial expenses, and the costs of estate administration necessitated by reason of the injuries which caused decedent's death.

54. Decedent's heirs claim damages for the loss of earnings, maintenance, support, comfort, care, society and/or other losses recognized under the Wrongful Death Act, which the Wrongful Death beneficiaries would have received from their father had his death not occurred.

55. Decedent's heirs claim damages for the monetary support that Decedent could have been expected to provide to the Wrongful Death beneficiaries during his lifetime had his death not occurred.

56. Plaintiff James, as the administrator of Decedent's estate, brings this action pursuant to the Survival Act, 42, Pa. C.S.A. §8302, under which all claims Decedent would have been able to bring had he survived may be brought by his estate.

57. Decedent's estate seeks to recover the full measure of damages recoverable under and by virtue of the Survival Act, including, but not limited to, the Decedent's total estimated future earning capacity, less his personal maintenance costs, as well as damages for Decedent's physical discomfort, pain and suffering, loss of enjoyment of life and life's pleasures, and all other damages and losses recoverable under the Survival Act.

**COUNT I: 42 U.S.C. § 1983**
**PROCEDURAL DUE PROCESS – FOURTEENTH AMENDMENT**
**PLAINTIFFS V. ALL NAMED DEFENDANTS**

58. Plaintiffs hereby incorporate the preceding paragraphs of this Complaint, as set forth above.

59. By their conduct described above, the Defendant were deliberately indifferent to Decedent's known risk of suicide.

60. As a result, Decedent was place in a holding cell alone, unmonitored, without mental health assessment, which would have revealed his increasingly agitated state of mind.

61. Decedent's suicide was the direct and proximate result of the failures of the defendants outlined above and violated Decedent's right to due process of law under the Fourteenth Amendment to the United States Constitution.

**COUNT II - 42 U.S.C. § 1983**
***MONELL* CLAIM**
**PLAINTIFF V. CITY OF PHILADELPHIA**

62. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if set forth herein at full length.

63. On information and belief, based upon news articles, since 2015, there have been at least 15 suicides in Philadelphia City jails. How many of those occurred in police stations is unknown. The number of suicides supports the inference that Defendant City of Philadelphia has failed to train, supervise, investigate, or discipline in ensuring that suicide prevention protocols and procedures, as are embodied in Police Directive 7.8, are implemented, carried through, and enforced, the areas of investigation of allegations of student misconduct, and the disciplining the use of fabricated information.

64. This is evidenced by the systemic breakdown of implementing Directive 7.8 by every member of the Philadelphia Police Department who came into contact with Decedent prior to his suicide, including lying about the incident.

65. By these actions, Defendant City of Philadelphia has been deliberately indifferent to Decedent's known risk of suicide and has denied Decedent of his right to due process under the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

## DAMAGES

66. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if set forth herein at full length.

Defendants' conduct, individually and jointly, was intentional, malicious, and warrants the imposition of punitive damages.

**WHEREFORE**, Plaintiffs request the following relief:

a. compensatory damages;

b. punitive damages against the individual defendants in Counts I;

c. reasonable attorney fees and costs, if applicable; and

d such other relief as appears reasonable and just.

Respectfully submitted,

**James, Schwartz, and Associates, P.C.**

Jonathan James

By: Jonathan J. James, Esquire
1500 Walnut Street -- 7th Floor
Philadelphia, PA 19102
jjames@civilrightspa.com
Tel: (215) 751-9865
Fax: (215) 751-0658
Attorney for Plaintiff

## DEMAND FOR JURY TRIAL

**PLEASE TAKE NOTICE** that Plaintiffs demand a trial by jury as to all issues pursuant to the Rules of this Court.

Jonathan James

By: Jonathan J. James, Esquire